WO

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Chad Alan Lee,                              )        No. CV-01-2178-PHX-EHC
                                            )        No. CV-01-2179-PHX-EHC
                                            )
                    Petitioner,             )        <u>DEATH PENALTY CASE</u>
                                            )
        v.                                  )
                                            )
Dora B. Schriro, et al.,                    )        **MEMORANDUM OF DECISION**
                                            )        **AND ORDER**
                                            )
                    Respondents.            )
                                            )
_____ )

        Chad Alan Lee (Petitioner) has filed an Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, alleging that he is imprisoned and sentenced to death in violation of the United States Constitution. (Dkt. 59.)[1] For the reasons set forth herein, the Court determines that Petitioner is not entitled to habeas relief.

## BACKGROUND

        In two separate trials, Petitioner was tried for committing three murders during a crime spree in April 1992. In the first trial, Petitioner was convicted of first degree murder in the deaths of Linda Reynolds and David Lacey, as well as kidnapping, sexual assault, armed robbery, and theft with respect to Reynolds and armed robbery with respect to Lacey. Several months later, Petitioner was convicted of the murder and armed robbery of Harold Drury. Maricopa County Superior Court Judge Ronald S. Reinstein sentenced Petitioner to

_____

        [1]        "Dkt." refers to the documents in this Court's file.

1   death for each of the murders and to various terms of imprisonment for the non-capital

2   counts.  Petitioner appealed the judgments from each trial separately.  In the first of two

3   consecutive opinions affirming Petitioner's convictions and sentences, the Arizona Supreme

4   Court summarized the pertinent facts and procedural history surrounding the Reynolds/Lacey

5   crimes:[2]

6   *Murder of Linda Reynolds*

7          On April 6, 1992, defendant and David Hunt called Pizza Hut from a
       pay phone and placed an order to be delivered to a vacant house.  When Linda
8       Reynolds arrived with the pizza order, defendant and Hunt confronted her with
       a rifle, forced her to remove her shorts and shirt, and abducted her.  Defendant
9       drove his Pontiac LeMans into the desert with Reynolds, and Hunt drove
       Reynolds' car to meet them.
10
          Defendant removed the stereo from Reynolds' car and then destroyed
11      the car by smashing windows and various parts with a bat, puncturing the tires,
       and disabling the engine by cutting hoses and spark plug wires.  Reynolds
12      watched as one of the two, either defendant or Hunt, shot a bullet through the
       hood of her car.  Defendant testified he destroyed Reynolds' car so that she
13      could not escape.

14          Reynolds was forced to remove her pantyhose, socks, and shoes and to
       walk barefoot with Hunt in the desert north of her car where he raped her.
15      Hunt then walked Reynolds back toward her car, where defendant forced
       Reynolds to perform oral sex on him.
16
          After finding Reynolds' bank card in her wallet, defendant drove her
17      and Hunt to Reynolds' bank to withdraw money from an automated teller
       machine (ATM).  Defendant gave Reynolds his flannel shirt to wear, walked
18      her to the ATM, and forced her to withdraw twenty dollars.  Defendant and
       Hunt then drove Reynolds back to the desert north of where they had
19      destroyed her car.  Reynolds momentarily escaped, but Hunt found her and
       forced her back to the car.  When she returned, her face and lips were bloody.
20
          Defendant claimed that he and Hunt argued in front of Reynolds about
21      whether to release her.  Defendant testified that Hunt was opposed to releasing
       her because she would be able to identify them.  Defendant stated that as he
22      was escorting Reynolds away from Hunt, defendant shot her in the head as she
       attempted to take the gun from him.  Further, defendant testified that he ran
23      back to the car, got a knife, went back to Reynolds, and stabbed her twice in
       the left side of her chest to stop her suffering.  Defendant returned to his car
24      and drove away with Hunt.

25   _____

26          [2]     This Court has independently reviewed the state court records and concludes
27   that the Arizona Supreme Court's factual recitations on appeal accurately recount the
     evidence adduced at each trial.

1
2

    On April 7, 1992, defendant pawned Reynolds' wedding ring, gold ring, and car stereo for a total of $170. He filled out a sales slip and used his driver's license as identification.

3

*Murder of David Lacey*

4
5
6
7
8
9
10

    Shortly after midnight on April 16, 1992, nine days after the Reynolds murder, defendant called for a cab from a pay telephone at a convenience store. David Lacey's cab was dispatched, and he picked up defendant. Hunt, who had waited near the convenience store, drove defendant's car to the location where he and defendant intended to rob Lacey. When Lacey stopped the cab and turned around to get paid, defendant pulled out his revolver and demanded money. Defendant claimed that Lacey turned around and attempted to grab the gun. Defendant then fired nine shots, four of which hit Lacey. Defendant removed forty dollars from Lacey's pockets and dumped his body by the side of the road. With Hunt following, defendant drove the cab to a dirt road where he shot the cab's windows and tires and rifled through its contents. Defendant's cigarette lighter and bloody fingerprint on a receipt were later found in the abandoned cab.

11
12
13
14

    After hearing news reports that police had found distinctive shoeprints at the Reynolds and Lacey crime scenes, defendant drove to a forest north of Prescott and burned the shoes he had worn during both murders. At the same time, defendant burned and buried two .22 caliber rifles including one gun he used to shoot Reynolds. Defendant left the knife he used to stab Reynolds stuck into a tree at the same location.

15

*Investigation*

16
17
18

    Police began their investigation of Reynolds' disappearance the evening of April 6, 1992, at her last delivery site and found her body on April 7. They obtained videotape from the ATM that depicted a Pontiac LeMans with Reynolds sitting in the front passenger seat and also showed her at the ATM with defendant standing next to her.

19
20
21

    A patrol officer who responded to two Lacey crime scenes noticed that the shoeprints found at both scenes matched a shoeprint he had seen on a flyer containing information about the Reynolds murder. Subsequently, the Phoenix Police Department, investigating the Reynolds murder, and the Maricopa County Sheriff's Department, investigating the Lacey murder, began a joint investigation because of striking similarities between the two crimes.

22
23
24
25
26

    Pizza Hut provided police with information about past orders that included Hawaiian pizza similar to the last order delivered by Reynolds. One such order had been placed from the home of Hunt's stepmother. On May 1, 1992, Hunt's stepmother told police that Hunt and defendant had ordered Hawaiian pizza in the past and that she had recognized defendant's photograph in the newspaper. She gave police Hunt's father's address where police found Hunt, his father, and defendant. Defendant and Hunt agreed to provide police a sample of their fingerprints and did so that day. A few hours later, defendant, Hunt, and their girlfriends left town in defendant's car.

27

    On May 3, 1992, at 4:00 p.m., defendant, Hunt, and their girlfriends

were stopped by police in Oak Creek Canyon in connection with an armed robbery in Flagstaff.  Defendant was advised of his *Miranda* rights and transported to the Flagstaff Police Department.  That evening defendant was advised of his *Miranda* rights again and signed a waiver form.

Later that day, a palm print found on Reynolds' car was identified as belonging to Hunt.  While attempting to alert law enforcement officers to detain defendant's car, police learned that it had been impounded in Flagstaff. Detectives from the Phoenix Police Department and the Maricopa County Sheriff's Department drove to Flagstaff to interview defendant and Hunt.  On the way, the detectives received information that the bloody fingerprint found on the receipt in Lacey's cab matched defendant's print.

The detectives interviewed the girlfriends, then Hunt, and then defendant.  In defendant's interview, which began at 2:45 a.m., May 4, after he was again read his *Miranda* rights, he confessed to robbing and murdering Reynolds and Lacey and told detectives how and where he had disposed of the weapons.  He offered to assist police officers in locating the weapons he used to murder Reynolds.

On May 5, 1992, a Phoenix Police detective met with defendant at the Coconino County Jail and again advised him of his *Miranda* rights.  Defendant agreed to talk and then accompanied the police officers, directing them to the campsite where he had hidden a single-shot, sawed-off .22 caliber rifle and semi-automatic .22 caliber rifle and left a knife in a nearby tree.  Defendant told officers that he used the knife to stab Reynolds and the single-action rifle to shoot her.  Defendant further confessed in detail about his involvement in both murders to the Phoenix Police detective and later to two other officers during transport back to Coconino County Jail.

On May 6, 1992, a Maricopa County Sheriff's Department detective reinterviewed defendant about the Lacey murder and robbery because the tape recorder had not functioned properly during the prior interview.  On tape, defendant waived his *Miranda* rights and retold how he planned the robbery and shot Lacey to death.

Finally, defendant testified at trial and admitted that he made the pizza order, destroyed Reynolds' car, shot and stabbed Reynolds, and pawned her rings and stereo.  Defendant also admitted that he called the cab and shot Lacey in the head.  Further, defendant testified at trial that all statements he made to police officers were of his own free will, that he was advised of his *Miranda* rights, and that he told officers he understood his rights.

*State v. Lee (Lee I)*, 189 Ariz. 590, 595-97, 944 P.2d 1204, 1209-11 (1997).  In its opinion

regarding the Drury crimes, the Arizona Supreme Court stated:

Around 1:00 a.m. on April 27, 1992, defendant Lee entered an AM-PM market to purchase some cigarettes.  After the store clerk, Harold Drury, opened the cash drawer, defendant displayed his revolver and shot Drury in the shoulder, causing him to fall slightly backwards.  Defendant then shot Drury in the top of the head, the forehead, the cheek, and the neck.  Drury slumped to the floor.  Defendant walked around the counter and shot Drury two more

times in the right temple.  One bullet went through Drury's head and broke the display case next to his body.  Defendant picked up the cigarettes, took the entire cash drawer from the register, and left the store.  Scott Hunt was in defendant's car waiting to leave the scene.

Hunt immediately drove defendant across the street where defendant removed the cylinder from his revolver and threw both parts into a dumpster. Hunt then drove for several miles, and defendant attempted to throw the cash drawer into a creek bed.  The drawer, however, smashed into a concrete abutment on the overpass, prompting defendant and Hunt to go back, pick up the drawer, and throw it into the creek bed.

Shortly after the murder, customers found Drury behind the counter and called the police.  Upon entering the store, the police saw the cash register open and the cash drawer missing.  The register tape showed an incomplete transaction for cigarettes.

During three separate interviews, defendant confessed to robbing the AM-PM market and shooting Drury: May 4, 1992, at 2:45 a.m. at the Coconino County Jail where defendant was in custody for other crimes; May 5, 1992, when defendant showed police where he had disposed of the Reynolds (*Lee I*) murder weapons; and May 6, 1992, at the Maricopa County Sheriff's Office in Phoenix where the interview was recorded.

During the first interview, defendant described to detectives where the drawer first landed and where he eventually threw it into the creek bed.  On their return to Phoenix, the detectives located the pieces of the cash drawer and the drawer itself in the weeds under the bridge that defendant identified.  They photographed each scene and preserved the evidence.

*State v. Lee (Lee II)*, 189 Ariz. 608, 612, 944 P.2d 1222, 1226 (1997).

In March 2000, following an unsuccessful petition for certiorari in the United States Supreme Court, *Lee v. Arizona*, 523 U.S. 1007 (1998), Petitioner filed a consolidated petition for post-conviction relief (PCR) pursuant to Rule 32.1 of the Arizona Rules of Criminal Procedure, challenging his convictions and sentences in all three murders and raising numerous claims for relief.  (*See* Dkt. 68, Ex. F.)  The trial court denied PCR relief on December 29, 2000, and the Arizona Supreme Court summarily denied a petition for review. (*Id.*, Exs. G, H, I.)

In November 2001, Petitioner filed two petitions for habeas corpus relief in this Court, which consolidated the petitions pursuant to Rule 42(a) of the Federal Rules of Civil Procedure. (Dkt. 3.) In March 2003, Petitioner filed a consolidated amended petition raising twenty-five grounds for relief and, in a series of motions, sought evidentiary development

1   of Claims 1-6, 8, 10, and 22-25. (Dkts. 59, 60, 89, 101.) In resolving the motions, the Court
2   determined that Claims 1 and 22 failed to state cognizable grounds for relief; Claims 2, 4, 5,
3   6, and 25 were procedurally barred; Claims 3, 4, and 24 failed on the merits; and Claim 23
4   was premature. (Dkts. 94, 106, 125.)

5       This order addresses Petitioner's remaining claims, Claims 7-21, including
6   Respondents' assertions that a number of these claims are procedurally barred from federal
7   habeas review.

8                   **PRINCIPLES OF EXHAUSTION AND PROCEDURAL DEFAULT**

9       Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a writ
10  of habeas corpus cannot be granted unless it appears that the petitioner has exhausted all
11  available state court remedies. 28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501
12  U.S. 722, 731 (1991); *Rose v. Lundy*, 455 U.S. 509 (1982). To exhaust state remedies, a
13  petitioner must "fairly present" the operative facts and the federal legal theory of his claims
14  to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526
15  U.S. 838, 848 (1999); *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S.
16  270, 277-78 (1971). If a habeas claim includes new factual allegations not presented to the
17  state court, it may be considered unexhausted if the new facts "fundamentally alter" the legal
18  claim presented and considered in state court. *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986).

19      In Arizona, there are two primary procedurally appropriate avenues for petitioners to
20  exhaust federal constitutional claims: direct appeal and post-conviction relief proceedings.
21  Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides
22  that a petitioner is precluded from relief on any claim that could have been raised on appeal
23  or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule
24  32.2(a) may be avoided only if a claim falls within certain exceptions (subsections (d)
25  through (h) of Rule 32.1) and the petitioner can justify why the claim was omitted from a
26  prior petition or not presented in a timely manner. *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b),
27  32.4(a).

1   A habeas petitioner's claims may be precluded from federal review in two ways.
2   First, a claim may be procedurally defaulted in federal court if it was actually raised in state
3   court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S.
4   at 729-30.  Second, a claim may be procedurally defaulted if the petitioner failed to present
5   it in state court and "the court to which the petitioner would be required to present his claims
6   in order to meet the exhaustion requirement would now find the claims procedurally barred."
7   *Id.* at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (stating that the
8   district court must consider whether the claim could be pursued by any presently available
9   state remedy).  If no remedies are currently available pursuant to Rule 32, the claim is
10  "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n.1; *see*
11  *also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996).

12  Because the doctrine of procedural default is based on comity, not jurisdiction, federal
13  courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*,
14  468 U.S. 1, 9 (1984).  As a general matter, the Court will not review the merits of a
15  procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure
16  to properly exhaust the claim in state court and prejudice from the alleged constitutional
17  violation, or shows that a fundamental miscarriage of justice would result if the claim were
18  not heard on the merits in federal court. *Coleman*, 501 U.S. at 750.

19  Ordinarily "cause" to excuse a default exists if a petitioner can demonstrate that "some
20  objective factor external to the defense impeded counsel's efforts to comply with the State's
21  procedural rule." *Id*. at 753.  Objective factors which constitute cause include interference
22  by officials which makes compliance with the state's procedural rule impracticable, a
23  showing that the factual or legal basis for a claim was not reasonably available, and
24  constitutionally ineffective assistance of counsel. *Murray v. Carrier*, 477 U.S. 478, 488
25  (1986).

26  There are two types of claims recognized under the fundamental miscarriage of justice
27  exception to procedural default:  (1) that a petitioner is "innocent of the death sentence," –

1   in other words, that the death sentence was erroneously imposed; and (2) that a petitioner is

2   innocent of the capital crime.  In the first instance, the petitioner must show by clear and

3   convincing evidence that, but for constitutional error, no reasonable factfinder would have

4   found the existence of any aggravating circumstance or some other condition of eligibility

5   for the death sentence under the applicable state law.  *Sawyer v. Whitley*, 505 U.S. 333, 336,

6   345 (1992).  In the second instance, the petitioner must show that "a constitutional violation

7   has probably resulted in the conviction of one who is actually innocent."  *Schlup v. Delo*, 513

8   U.S. 298, 327 (1995).

9                    **LEGAL STANDARD FOR RELIEF UNDER THE AEDPA**

10          Under the AEDPA, a petitioner is not entitled to habeas relief on any claim

11   "adjudicated on the merits" by the state court unless that adjudication:

12          (1) resulted in a decision that was contrary to, or involved an unreasonable
            application of, clearly established Federal law, as determined by the Supreme
13          Court of the United States; or

14          (2) resulted in a decision that was based on an unreasonable determination of
            the facts in light of the evidence presented in the State court proceeding.
15

16   28 U.S.C. § 2254(d).  The phrase "adjudicated on the merits" refers to a decision resolving

17   a party's claim which is based on the substance of the claim rather than on a procedural or

18   other non-substantive ground.  *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).  The

19   relevant state court decision is the last reasoned state decision regarding a claim.  *Barker v.*

20   *Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-

21   04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

22          "The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule

23   of law that was clearly established at the time his state-court conviction became final."

24   *Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Therefore, to assess a claim under subsection

25   (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs

26   the sufficiency of the claims on habeas review.  "Clearly established" federal law consists

27   of the holdings of the Supreme Court at the time the petitioner's state court conviction

1   became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 127 S.Ct. 649 (2006): *Clark*

2   *v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if the

3   Supreme Court has not "broken sufficient legal ground" on a constitutional principle

4   advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529

5   U.S. at 381. Nevertheless, while only Supreme Court authority is binding, circuit court

6   precedent may be "persuasive" in determining what law is clearly established and whether

7   a state court applied that law unreasonably. *Clark*, 331 F.3d at 1069.

8        The Supreme Court has provided guidance in applying each prong of § 2254 (d)(1).

9   The  Court has explained that a state court decision is "contrary to" the Supreme Court's

10  clearly established precedents if the decision applies a rule that contradicts the governing law

11  set forth in those precedents, thereby reaching a conclusion opposite to that reached by the

12  Supreme Court on a matter of law, or if it confronts a set of facts that is materially

13  indistinguishable from a decision of the Supreme Court but reaches a different result.

14  *Williams*, 529 U.S. at 405-06; *see Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). In

15  characterizing the claims subject to analysis under the "contrary to" prong, the Court has

16  observed that "a run-of-the-mill state-court decision applying the correct legal rule to the

17  facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to'

18  clause." *Williams*, 529 U.S. at 406; *Lambert*, 393 F.3d at 974.

19       Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court

20  may grant relief where a state court "identifies the correct governing legal rule from [the

21  Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or

22  "unreasonably extends a legal principle from [Supreme Court] precedent to a new context

23  where it should not apply or unreasonably refuses to extend that principle to a new context

24  where it should apply." *Williams*, 529 U.S. at 407. In order for a federal court to find a state

25  court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the

26  petitioner must show that the state court's decision was not merely incorrect or erroneous,

27  but "objectively unreasonable." *Id.* at 409; *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)

1    (per curiam).

2          Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state

3    court decision was based upon an unreasonable determination of the facts.  *Miller-El v.*

4    *Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*).  A state court decision "based on a factual

5    determination will not be overturned on factual grounds unless objectively unreasonable in

6    light of the evidence presented in the state-court proceeding."  *Miller-El v. Cockrell*, 537

7    U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddux*, 366 F.3d 992, 999 (9th Cir. 2004).

8    In considering a challenge under § 2254(d)(2), state court factual determinations are

9    presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by

10   clear and convincing evidence."  28 U.S.C. § 2254(e)(1): *Miller-El II*, 545 U.S. at 240.

11   However, it is only the state court's factual findings, not its ultimate decision, that are subject

12   to § 2254(e)(1)'s presumption of correctness.  *Miller-El I*, 537 U.S. at 341-42 ("The clear and

13   convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to

14   state-court determinations of factual issues, rather than decisions.").

15         As the Ninth Circuit has noted, application of the foregoing standards presents

16   difficulties when the state court decided the merits of a claim without providing its rationale.

17   *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160,

18   1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  In those

19   circumstances, a federal court independently reviews the record to assess whether the state

20   court decision was objectively unreasonable under controlling federal law.  *Himes*, 336 F.3d

21   at 853; *Pirtle*, 313 F.3d at 1167.  Although the record is reviewed independently, a federal

22   court nevertheless defers to the state court's ultimate decision.  *Pirtle*, 313 F.3d at 1167

23   (citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853.  Only when a state

24   court did not decide the merits of a properly raised claim will the claim be reviewed de novo

25   because in that circumstance "there is no state court decision on [the] issue to which to

26   accord deference."  *Pirtle*, 313 F.3d at 1167; *see also Menendez v. Terhune*, 422 F.3d 1012,

27   1025-26 (9th Cir. 2005); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

1

**PETITIONER'S CLAIMS**

2

**Claim 7 - Petitioner's constitutional rights were violated by the cumulative effect of his trial counsel's deficient performance, or in the alternative, by the cumulative effect of the inadequate assistance he received from all of his state-appointed attorneys.**

3

4

5

Respondents contend that Petitioner never presented a "cumulative" claim of ineffective assistance of counsel (IAC) in state court and that any habeas claim predicated on this notion is procedurally barred. (Dkt. 68 at 36.) The Court agrees. Petitioner neglected to raise Claim 7 in state court. If he were to return to state court now, the claim would be found waived and untimely under Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of Criminal Procedure because it does not fall within an exception to Arizona's rule of preclusion. *See* Ariz. R. Crim. P. 32.2(b); 32.1(d)-(h). Therefore, Claim 7 is "technically" exhausted but procedurally defaulted because Petitioner no longer has an available state remedy. *Coleman*, 501 U.S. at 732, 735 n.1.

6

7

8

9

10

11

12

13

Petitioner implicitly acknowledges that he never raised Claim 7 in state court, but asserts he is excused from doing so because the claim includes an allegation of PCR counsel's ineffectiveness and "the Arizona Supreme Court has previously rejected the argument that a capital defendant is entitled to the effective assistance of post-conviction counsel." (Dkt. 82 at 53.) Therefore, Petitioner asserts, it is futile to attempt to exhaust this claim in state court. (*Id.*) The Court disagrees.

14

15

16

17

18

19

In *Sweet v. Cupp*, 640 F.2d 233, 236 (9th Cir. 1981), the Ninth Circuit recognized an exception to the exhaustion requirement if exhaustion in state court would be futile. Subsequently, in *Engle v. Isaac*, 456 U.S. 107, 130 (1982), the Supreme Court criticized the futility doctrine, ruling that it does not excuse the failure to exhaust a habeas claim in state court proceedings. The Court stated:

20

21

22

23

24

> If a defendant perceives a constitutional claim and believes it may find favor in the federal courts, he may not bypass the state courts simply because he thinks they will be unsympathetic to the claim. Even a state court that has previously rejected a constitutional argument may decide, upon reflection, that the contention is valid.

25

26

27

*Id.*  Following *Engle*, the Ninth Circuit rejected the futility doctrine and held that the apparent futility of presenting habeas claims to state courts does not constitute cause to overcome a procedural default.  *See Roberts v. Arave*, 847 F.2d 528, 530 (9th Cir. 1988). Therefore, the Court finds that futility does not constitute cause to excuse the default of Claim 7.  Petitioner does not argue that the failure to consider Claim 7 on the merits may result in a fundamental miscarriage of justice.  Accordingly, the Court finds that Claim 7 is procedurally barred.[3]

**Claim 8 - The trial court violated Petitioner's constitutional rights when it erroneously refused to suppress the statements he involuntarily made to police.**

Petitioner asserts that the trial court's failure to suppress his statements to the police violated his constitutional rights. (Dkt. 59 at 114.)  Specifically, he asserts that his statements were not voluntary and that his waiver of his constitutional rights was neither knowing nor intelligent.  (*Id.* at 112.)

*Background*

Petitioner was arrested in Oak Creek Canyon near Sedona, Arizona on the afternoon of May 3, 1992, after a police officer observed the car he was driving and believed it matched the description of a car used by persons involved in an armed robbery earlier that day in a store parking lot in Flagstaff.  *Lee  I*, 189 Ariz. at 596, 944 P.2d at 1210.  Petitioner was taken to the Flagstaff police department where he was eventually interrogated by two officers:  Lee Luginbuhl with the Maricopa Country Sheriff's Office, who was investigating the murder of David Lacey, and Mike Chambers of the Phoenix Police Department, who was investigating the murder of Linda Reynolds.  During this interrogation, Petitioner confessed to robbing and killing Lacey, Reynolds, and Drury.  (RT 3/16/94 at 147-80; RT 3/17/94 at

---

[3]        Moreover, as fully explained by the Court in its February 2005 order with regard to Claim 1 (alleging IAC of PCR counsel), that aspect of Claim 7 alleging ineffectiveness by PCR counsel fails to state a cognizable ground for federal habeas relief. (*See* dkt. 94 at 6-8.)

1  67-98; *see also* RT 8/25/94 at 11-23, 58-68.)[4]  In the days that followed, Petitioner made
2  similar statements to other officers.  (RT 3/15/94 at 164-80; RT 8/21/94 at 8-12; 18-23; 32-
3  36; RT 112-13.)

4       Prior to trial, Petitioner moved to suppress his statements.  At a hearing on the motion,
5  several law enforcement officers testified to the sequence of events following Petitioner's
6  arrest.  The arresting officer stated that he read Petitioner his *Miranda* rights from a card at
7  the time of his arrest.  (RT 1/28/94 at 31.)  After being taken to the Flagstaff police station,
8  Detective Mike Cicchinelli read Petitioner his *Miranda* rights and questioned him about an
9  armed robbery.  (*Id.* at 11-12.)  Petitioner indicated he understood his rights, agreed to waive
10  them, and signed a card to this effect.  (*Id*. at 12.)  The detective testified that he did not
11  promise, threaten, or coerce Petitioner to waive his rights.  (*Id.*)

12       After learning that Petitioner was in custody, Detectives Luginbuhl and Chambers
13  drove to Flagstaff, arriving at the station at about 9:00 or 10:00 p.m.  (*Id.* at 50, 80.)  After
14  talking to the others who were arrested with Petitioner, including David Hunt, they
15  commenced an interrogation with Petitioner at about 2:45 a.m. on the morning of May 4.  (*Id.*
16  at 50-51.)  The interrogation lasted a little over an hour, concluding just before 4:00 a.m.  (*Id.*
17  at 55.)  The officers attempted to tape record the interview, but the recorder malfunctioned.
18  (*Id.* at 53-54, 90-91.)

19       When Detective Chambers and Luginbuhl first entered the interview room, Petitioner
20  was seated at a table, had his head down, and appeared to be sleeping.  (*Id.* at 87.)  Petitioner
21  was Mirandized prior to questioning, stated he understood his rights, and agreed to talk.  (*Id.*
22  at 52-53, 89-90.)  Petitioner was allowed to go to the restroom just before questioning started
23  and was given water to drink.  According to the detectives, Petitioner never indicated that he
24  did not wish to answer questions, was alert, spoke coherently, and did not seem to be under

25  _____

26       [4]    "RT" refers to the reporter's transcripts in both the Reynolds/Lacey and Drury
27  trials.  As is customary in this District, the Arizona Supreme Court provided the original
   transcripts to this Court for use in these proceedings.  (*See* Dkt. 18.)

the influence of drugs or alcohol.  (*Id*. at 54,  91-92.)  They further stated that they made no promises and did not threaten or coerce Petitioner.  (*Id*. at 55; 92-93.)

During the course of questioning by Detectives Chambers and Luginbuhl, Petitioner indicated he left the murder weapons at a remote location near Prescott.  (RT 3/16/94 at 178-79.)  The next day, following up on these statements, Phoenix Police Detective Charles Gregory interviewed Petitioner.  Gregory read Petitioner his *Miranda* rights, and Petitioner stated he understood his rights and agreed to talk.  (RT 1/28/94 at 116-17.)  Petitioner then told Gregory the general location near Prescott where he left the weapons and subsequently led officers to a campsite where the weapons were found.  (*Id.* at 118-20.)  According to Gregory, Petitioner did not appear tired or fatigued, spoke coherently, and seemed to understand everything.  Gregory also testified that he made no promises and did not coerce Petitioner into answering questions.  (*Id.* at 122-23.)

While en route back to Flagstaff with Detectives Terry Kenney and Raoul Osegueda, Petitioner asked to talk "off the record."  (*Id.* at 146.)  When told that was not possible, Petitioner nevertheless related to them his involvement in the three murders.  (*Id.* at 147, 155.)  According to the detectives, Petitioner told this story voluntarily, without prompting, and without any promises, threats, or use of coercion.  (*Id.* at 146-48, 155-57.)

On the afternoon of May 6, 1992, Detective Luginbuhl recorded an interview with Petitioner regarding the Lacey murder.  Prior to questioning, Petitioner was Mirandized, stated he understood his rights, and agreed to be interviewed. (*Id*. at 59.)  Petitioner's speech was coherent.  (*Id*. at 60.)  Luginbuhl testified that he made no promises to Petitioner and used no coercion to get him to speak.  (*Id.*)  During this interview, Petitioner repeated his involvement in the murders.  (RT 8/25/94 at 20-23.)

Petitioner also testified at the suppression hearing.  On direct examination, he stated he was a poor student and had a grade point average of 1.2, ranking him 462 out of a class of 543. (RT 1/31/94 at 5-6.)  He thinks he was Mirandized when initially arrested, but could not remember if he was Mirandized after being brought to the Flagstaff police department;

he conceded signing a waiver.  (*Id*. at 7, 10.)  Petitioner was tired when he was brought to the station, dozed while waiting in an interrogation room, and was dozing with his head on the table when Detective Chambers entered the room.  (*Id*. at 15.)  He described himself as "walking into walls" at the time the interview began and only a "little bit" alert.  (*Id.* at 17.)  Petitioner did not remember being Mirandized prior to the interview with Chambers and Luginbuhl, did not understand that he did not have to speak with them, and claimed he would not have agreed to talk if he had fully understood his rights.  (*Id.* at 19-22.)

Petitioner thought he told Chambers and Luginbuhl he would show them the campground near Prescott where the weapons and other evidence were left.  (*See* RT 1/31/94 at 21-22.)  He admitted talking about his involvement in the murders to police officers during the trip to and from the campground but said he made those statements because he "didn't think it mattered" in light of the fact that he had already confessed to Chambers and Luginbuhl.  (*Id*. at 22-23.)  If he had not already made those incriminating statements, Petitioner stated he never would have lead officers to the murder weapons or made further incriminating statements.  (*Id.* at 24.)

On cross-examination, Petitioner could not remember but indicated it was possible he was advised of his rights upon his initial arrest, as well as after he was brought to the police station and questioned by Detective Cicchinelli about an armed robbery, and again at the beginning of his interrogation by Chambers and Luginbuhl.  (*Id.* at 26-67.)   He further testified that none of the detectives made any promises or threats, or used coercion to get him to talk.   He did not remember asking for an attorney during questioning.   (*Id.*)

Petitioner's psychological expert, Mickey McMahon, Ph.D., also testified at the suppression hearing.  He opined that Petitioner suffered from Attention Deficit Disorder (ADD) and consequently might have had difficulty processing the meaning of his *Miranda* rights.  (RT 1/28/94 at 164-186.)  Dr. McMahon also opined that Petitioner displayed a submissive personality.  As a result, Petitioner was prone to be submissive to authority and likely to relinquish his right to silence out of a desire to please authority figures such as

police officers. (*Id.* at 168-71.) Under cross-examination, Dr. McMahon stated that someone who suffers from ADD and a submissive personality was capable of understanding their rights and could also have committed a crime and confessed to that crime because they were guilty. (*Id.* at 211-16.) The State's rebuttal expert, clinical psychologist Jeffrey Harrison, testified that Petitioner might suffer from a mild learning disability but opined that this would not have impaired his ability to understand his *Miranda* rights. (RT 2/10/94 at 6, 8-9.)

In denying the motion to suppress, the trial court found that Petitioner had been advised of his rights on at least five occasions and that a preponderance of the evidence established Petitioner was properly advised and understood his rights. (ME doc. 82.)[5] The court concluded that Petitioner's statements were not the result of promises, force, threats, or coercion, but were made knowingly, intelligently, and voluntarily. (*Id.*)

On direct appeal, the Arizona Supreme Court upheld the trial court's ruling:

> Defendant claims that the trial court abused its discretion by ignoring his physical and mental condition at the time of the May 4, 1992 interrogation in Flagstaff. Defendant claims that at the 2:45 a.m. interview he was exhausted and disoriented because of the time of night, because police had disturbed his sleep by checking on him, and because he had not slept well while camping the previous two nights. He further claims that his will was overborne by the interrogating officers because he has attention deficit disorder and quickly succumbs to authority figures, a tendency he argues had been substantiated by psychological testing.
>
> To determine the voluntariness of a statement, the appropriate inquiry is whether, under the totality of the circumstances, the statement was the product of coercive police tactics. *State v. Tucker*, 157 Ariz. 433, 445-46, 759 P.2d 579, 591-92 (1988) (citing *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986)). "The trial court's determination that a confession was voluntary will not be disturbed on appeal absent clear error." *Id.* at 444, 759 P.2d at 590.
>
> The trial court conducted a suppression hearing and found that defendant had been advised of his *Miranda* rights on at least five separate occasions by different police officers, that he understood his rights on each of those occasions, and that he knowingly, intelligently, and voluntarily waived those rights. The trial court also found that his statements were knowingly and voluntarily made and were not given as a result of police misconduct. These

---

[5]    "ME doc." refers to one volume of enumerated minute entries from the Drury record on appeal filed with the Arizona Supreme Court in Case No. CR-94-0367-AP. (*See* dkt. 18.)

findings are not only supported by testimony of police officers, but also by defendant's testimony at trial that all statements he made to police officers were of his own free will, that he was advised of his *Miranda* rights, and that he told officers he understood his rights. The record does not suggest that police tactics were coercive. We find no clear error in the trial court's denial of defendant's motion to suppress his statements.

*Lee I*, 189 Ariz. at 600-01, 944 P.2d at 1214-15.[6]

*Analysis*

In evaluating the voluntariness of a confession, "the test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Derrick v. Peterson*, 924 F.2d 813, 817 (9th Cir. 1990) (citing *Haynes v. Washington,* 373 U.S. 503, 513-14 (1963)).   Coercive police activity, including lengthy questioning, deprivation of food or sleep, physical threats of harm, and psychological persuasive, is a necessary predicate to a finding that a confession is not voluntary. *Colorado v. Connelly*, 479 U.S. 157, 167, (1986). Personal characteristics of the defendant are constitutionally irrelevant absent proof of coercion. *Derrick*, 924 F.2d at 818.

The waiver of a defendant's right to silence must also be knowing and voluntary; that is, the defendant understood the right to remain silent and that relinquishment of that right meant anything he said could be used as evidence against him. *Colorado v. Spring*, 479 U.S. 564, 574 (1987). A defendant need not know and understand every possible consequence of a waiver of his rights. *Id*. *Miranda* warnings ensure a defendant understands these rights by informing him that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time. *Id.*

Although the ultimate issue of voluntariness is a mixed question of law and fact, *Miller v. Fenton*, 474 U.S. 104, 111-12 (1985), subject to review under the standards set forth in 28 U.S.C. § 2254(d)(1), any subsidiary factual findings made by the state court are entitled

---

[6]        Petitioner also raised this issue in the Drury appeal.  The Arizona Supreme Court rejected this claim in summary fashion, noting it had discussed and rejected the claim in *Lee I*.  *See Lee II*, 189 Ariz. at 613, 944 P.2d at 1227.

to a "presumption of correctness" under § 2254(e)(1).  These include findings concerning the tactics used by the police and other circumstances of the interrogation.  *Miller*, 474 U.S. at 112, 117.  With respect to such findings, Petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see Williams*, 529 U.S. at 407; *Villafuerte v. Stewart*, 111 F.3d 616, 626 (9th Cir. 1997).

In this case, undisputed evidence was presented at the suppression hearing that Petitioner was informed of his *Miranda* rights on five separate occasions in the days following his arrest on May 3, 1992, including prior to the commencement of the interrogation by Detectives Luginbuhl and Chambers in the early morning hours of May 4, when he made his initial confession to the murders of Reynolds, Lacey, and Drury.  During that interview (and on the other occasions when he admitted guilt), Petitioner indicated he understood those rights and that he agreed to waive them and talk to the officers.  Regarding his statements to Officers Kenney and Osegueda while being transported from the Prescott campground where the weapons were found, testimony indicated he made spontaneous inculpatory statements without being questioned or prompted.

Petitioner argues that his statements and waiver of rights were not voluntary because he was "sleep-deprived and emotionally exhausted when the police began questioning him." (Dkt. 59 at 112.)  Although Petitioner's interview on May 4 did not commence until around 2:45 a.m., the evidence shows Petitioner was alone for hours prior to commencement of the interview and that he was not hindered from sleeping and did in fact sleep during this period. Nothing in the record contradicts the officers' testimony that Petitioner was alert, coherent, and not under the influence of drugs and alcohol.  Nor is there any allegation that Petitioner was threatened, coerced, or given promises in exchange for his waiver of rights.

Petitioner also argues that he was "vulnerable to the officers' interrogation tactics" because of neurological impairments related to fetal alcohol exposure. (Dkt. 59 at 112.)  As discussed by the Court in its March 24, 2006 order, Petitioner is not entitled to expand the record with new evidence pertaining to his alleged *in utero* alcohol exposure because

Petitioner had an opportunity during the state court pretrial suppression hearing to fully develop any facts relevant to his voluntariness claim. (Dkt. 106 at 5.) Although he did not present evidence from an expert that he suffered from a low mental capacity and ADD, he did not make any assertions of neurological impairment resulting from fetal alcohol exposure. Because Petitioner did not act with diligence to develop this aspect of Claim 8 and does not assert that he can satisfy the requirements of 28 U.S.C. § 2254(e)(2)(A) & (B), this Court may not consider Petitioner's new allegations of neurological impairment in determining whether his waiver of rights was voluntary.

The Court concludes, based on its review of the record, that the Arizona Supreme Court's conclusion that Petitioner's statements were voluntary was not contrary to, or an unreasonable application of, clearly established Supreme Court law nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). This conclusion is further supported by Petitioner's own testimony at trial, wherein he explicitly stated he encountered no coercion from the officers during any of his interrogations:

Q.    You are not afraid of Detective Chambers?

A.    No.

Q.    You are not afraid of Detective Luginbuhl?

A.    No.

Q.    And neither Detective Luginbuhl or Detective Chambers ever made any threats toward you, did they?

A.    No.

Q.    They never coerced you in any way to make any statements, did they?

A.    I don't know. I really don't know exactly about coerce or anything like that.

Q.    Coercion? They didn't force you to say what you said to them, did they?

A.    No.

Q.    You said what you said to them of your own freewill, didn't you?

A.    Yes.

1    Q.    As a matter of fact all the detectives that you spoke to in this case,
2          Luginbuhl, Chambers, Gregory, Osegueda, Kenny Martinez, you told
           them everything of your own free will?

3    A.    Yes.

4    (RT 3/21/94 at 144-45.)

5          Similarly, the Arizona Supreme Court's determination that Petitioner's waiver of his

6    constitutional rights was knowing and voluntary was not contrary to, or an unreasonable

7    application of, clearly established Supreme Court law nor was it based on an unreasonable

8    determination of the facts.  28 U.S.C. § 2254(d).  The evidence indicated Petitioner was

9    informed of his *Miranda* rights on five separate occasions, which Petitioner does not dispute.

10   Although Petitioner asserted during his testimony at the suppression hearing and again at trial

11   that he did not understand these rights, he acknowledged telling officers he understood these

12   rights when questioned.  (*See* RT 3/21/94 at 146.)  In addition, during the suppression

13   hearing, Petitioner's own expert witness stated that Petitioner had an IQ of 100 and that, even

14   though he suffered from ADD, was capable of understanding his rights.  Likewise, although

15   the State's rebuttal expert described Petitioner as possibly mildly learning impaired, he also

16   opined that this impairment would not have prevented Petitioner from understanding his

17   *Miranda* rights.

18         **Claim 9 - The trial court violated Petitioner's constitutional rights when
           it erroneously refused to sever the Reynolds and Lacey counts.**

19         Prior to his first trial, Petitioner moved to sever the Reynolds and Lacey counts.  The

20   trial court denied the motion, concluding that the counts were properly joined for trial:

21         The Court Finds that the offenses charged in the Reynolds and Lacey
22         deaths are of the same or a similar character and also that they are alleged to
           have been part of a common scheme or plan.  There are many similarities in
23         the alleged offenses which involve two separate victims, and the allegations
           clearly involve a plan to rob individuals who have ready cash available in
24         order to obtain money.

25   (ME doc. 125.)

26         On appeal, citing state law, the Arizona Supreme Court rejected the trial court's

27   rationale that joinder of the Reynolds/Lacey counts in one trial was appropriate because they

arose from a common plan or scheme, concluding "that the counts were not properly joined under Rule 13.3(a)(3) and that the trial court abused its discretion by denying defendant's severance motion." *See Lee I*, 189 Ariz. at 599, 944 P.2d at 1213.  However, the court further noted:

> The trial court's error will not justify reversal if the evidence of other crimes would have been admissible at separate trials under Rule 404(b). Admission of evidence of prior bad acts is controlled by four protective provisions: (1) the evidence must be admitted for a proper purpose under Rule 404(b); (2) the evidence must be relevant under Rule 402; (3) the trial court may exclude evidence if its probative value is substantially outweighed by the potential for unfair prejudice under Rule 403; and (4) the court must give an appropriate limiting instruction if requested under Rule 105.

*Id.* (citations omitted).  The court then analyzed each of these factors and concluded that "if the trial court had severed the Reynolds and Lacey counts, evidence of each would have been mutually admissible.  The trial court's error in finding a common scheme or plan as a basis for denying defendant's severance motion was thus harmless and does not justify reversal." *Id.* at 600, 944 P.2d at 1214.

　　　*Analysis*

　　　Improper joinder does not, in itself, violate the Constitution. *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986).  Misjoinder rises to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial. *Id.*; *see also Fields v. Woodford*, 309 F.3d 1095, 1110 (9th Cir. 2002); *Sandoval v. Calderon*, 241 F.3d 765, 771-72 (9th Cir. 2000).  Prejudice exists if the impermissible joinder had a "substantial and injurious effect or influence in determining the jury's verdict." *Bean v. Calderon*, 163 F.3d 1073, 1086 (citing *Brecht v. Abramson*, 507 U.S. 619, 637 (1993)).

　　　Petitioner asserts that "the cross-contamination caused by the prosecution's simultaneous presentation of evidence of both the Reynolds and Lacey crimes rendered [his] trial and sentencing fundamentally unfair.  The particularly troubling facts of the Reynolds murder prevented the jury from an impartial consideration of the evidence against [Petitioner] on the Lacey counts." (Dkt. 59 at 115.)  Petitioner also contends that failing to sever the Reynolds and Lacey counts "prevented him from testifying about the Reynolds counts while

1  exercising his constitutional right against self-incrimination on the Lacey counts," thereby

2  forcing him to forego his right against self-incrimination on the Lacey counts.  (Dkt. 82 at

3  57.)

4          The Arizona Supreme Court's harmlessness determination was based on its

5  conclusion that under Arizona law all of the evidence presented at the joint trial would have

6  been cross-admissible in separate trials.  It is not the province of this court to sit in review

7  of that determination.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Moreover, the

8  evidence of Petitioner's guilt for both the Reynolds and Lacey murders was overwhelming.

9  Petitioner has failed to establish that the failure to sever the Reynolds and Lacey counts had

10  a substantial and injurious effect on the jury's verdicts.  Consequently, the failure to sever

11  did not render Petitioner's ensuing joint trial fundamentally unfair and did not violate his

12  right to due process.  *See Brecht*, 507 U.S. at 637; *see also Lane*, 474 U.S. at 446 n.8.

13          **Claim 10 - The trial court violated Petitioner's constitutional rights when,
            in *Lee II*, it required that he be shackled.**

14          On the morning of the first day of jury selection in the Drury trial, Petitioner, while

15  in a holding cell, assaulted a deputy and attempted to escape.  (RT 8/23/94 at 19-26.)

16  Consequently, he was brought into the courtroom that day in both leg and wrist restraints.

17  (*Id.* at 21.)  In argument to the court, Petitioner's counsel moved to have the restraints on

18  Petitioner's hands removed so he could take notes and aid in his defense and also argued that

19  such restraints would likely be apparent to the jury.  (*Id.* at 22.)  Counsel also requested that,

20  should the Court continue to restrict Petitioner's legs, simple restraints instead of a "hobble"

21  be used because "they are less visibly noticeable than the traditional hobble sometimes used."

22  (*Id.* at 25.)  A deputy told the judge that he could not insure the safety of everyone in the

23  courtroom and that "this gentleman has nothing to lose and as long as he has his hands free,

24  he is going to be a hazard to anybody in this courtroom."  (*Id.* at 24.)  The prosecutor also

25  relayed that Petitioner previously had been caught with a shank hidden in his shower slippers

26  at the jail.  (*Id.*)  When the trial court questioned Petitioner concerning his future behavior

27  in court, Petitioner stated, "Behave myself, I guess."  (*Id.* at 21.)  In a minute entry issued

later that day, the trial court directed that Petitioner be restrained by a leg brace in lieu of a

hobble and that he be allowed one free hand and a pencil to assist counsel during trial.  (ME

doc. 147 at 6.)

Petitioner raised this issue on direct appeal.  In upholding the trial court's decision to

restrain Petitioner during trial, the Arizona Supreme Court stated:

> Defendant argues that the trial court erred by shackling him during trial
> because he took copious notes during *Lee I* and shackling his hands affected
> his ability to participate in the Drury trial.  Complying with defendant's
> request, the court ordered that he be restrained with a leg brace in lieu of a
> hobble and that he be allowed one free hand to use a short pencil for assisting
> counsel during trial.

> "Whether a defendant will be shackled is within the sound discretion
> of the trial court."  *State v. Bracy,* 145 Ariz. 520, 532, 703 P.2d 464, 476
> (1985).  Courtroom security is within the discretion of the trial court" 'absent
> incontrovertible evidence'" of harm to the defendant.  *State v. McKinney,* 185
> Ariz. 567, 576, 917 P.2d 1214, 1223, *cert. denied,* 519 U.S. 934, 117 S.Ct.
> 310, 136 L.Ed.2d 226 (1996) (quoting *State v. Boag,* 104 Ariz. 362, 366, 453
> P.2d 508, 512 (1969)).  When the trial court's decision to restrain a defendant
> is supported by the record, this court will uphold the decision, even when the
> jury sees the restraints.  *Id.*  The trial court may consider past felony
> convictions for crimes of violence as well as prior escapes in deciding whether
> to shackle a defendant.  *Bracy* at 532, 703 P.2d at 476.

> Here, the defendant had prior convictions for three armed robberies  and
> two first degree murders.  Further, the record shows that defendant received
> a head injury as a result of tackling a deputy and attempting to escape from a
> holding cell before coming to court for the first day of trial and jury selection.
> The record clearly supports the trial court's decision to restrain defendant, and
> we find no abuse of discretion.

*Lee II*, 189 Ariz. at 617, 944 P.2d at 1231.

*Analysis*

The Due Process Clause forbids the routine use of physical restraints visible to the

jury.  *Deck v. Missouri*, 544 U.S. 622, 626 (2005).  The use of restraints requires a

determination by the trial court that the restraints are justified by a specific state interest

particular to a defendant's trial.  *Id.* at 629; *see Ghent v. Woodford*, 279 F.3d 1121, 1132 (9th

Cir. 2002) (criminal defendant has a constitutional right to be free of shackles in the presence

of the jury absent an essential interest that justifies the physical restraints); *Rhoden v.*

*Rowland*, 172 F.3d 633, 636 (9th Cir. 1999) (same).  This is because a "jury's observation

of a defendant in custody may under certain circumstances 'create the impression in the minds of the jury that the defendant is dangerous or untrustworthy' which can unfairly prejudice a defendant's right to a fair trial notwithstanding the validity of his custody status." *United States v. Halliburton*, 870 F.2d 557, 559 (9th Cir. 1989) (quoting *Holbrook v. Flynn*, 475 U.S. 560, 569 (1986)).

To obtain habeas relief, a court must find that the defendant was physically restrained in the presence of the jury, that the shackling was seen by the jury, and that the physical restraint was not justified by state interests. *Ghent*, 279 F.3d at 1132. A jury's "brief or inadvertent glimpse" of a shackled defendant is not inherently or presumptively prejudicial. *Id.* at 1133; *see also Duckett v. Godinez*, 67 F.3d 734, 749 (9th Cir. 1995) (claim of unconstitutional shackling subject to harmless-error analysis); *United States v. Olano*, 62 F.3d 1180, 1190 (9th Cir. 1995). An unjustified decision to restrain a defendant at trial requires reversal only if the shackles or handcuffs had "a substantial and injurious effect or influence in determining the jury's verdict." *Castillo v. Stainer*, 983 F.2d 145, 148 (9th Cir. 1992), *amended by* 997 F.2d 669 (9th Cir. 1993) (quoting *Brecht*, 507 U.S. at 623)).

Petitioner summarily asserts that his "restraints were visible to the jury." (Dkt. 59 at 117.) However, there is nothing in the record to support this assertion, and Petitioner has not proffered any evidence to substantiate this claim.[7] Petitioner has not cited, and this Court is not aware, of any controlling Supreme Court law indicating that a defendant's constitutional rights are violated by shackling that is not visible to a jury.

Even assuming members of the jury were aware that Petitioner was restrained, Petitioner is not entitled to relief because the Arizona Supreme Court's determination that the shackling was justified was not based on an unreasonable application of the facts. The trial court identified serious safety concerns created by Petitioner's holding cell assault on a deputy on the first day of trial. In addition, Petitioner previously had been caught with a

---

[7]     Petitioner's motion for discovery and an evidentiary hearing on this claim was denied by the Court in an earlier order. (*See* dkt. 94 at 22-23.)

shank while in jail.  The courtroom deputy stated that he could not insure the safety of those in the courtroom if Petitioner's hands were not restrained, and when the trial court questioned Petitioner concerning his prospective courtroom behavior, he  answered equivocally.  (RT 8/23/94 at 24, 21.)  Under these circumstances, and in light of the trial court's attempt to balance the safety concerns at issue with the prejudicial effect of restraints on Petitioner  by ordering that less apparent leg restraints be used and that one of Petitioner's hands be free to take notes during the proceedings, the Court concludes that the Arizona Supreme Court's determination that Petitioner's restraint during the Drury trial was appropriate was not contrary to or an unreasonable application of controlling Supreme Court law.  *See Deck*, 544 U.S. at 629;  *see also Morgan v. Bunnell*, 24 F.3d 49, 51 (9th Cir. 1994) (shackling of defendant during trial did not violate due process where defendant had displayed a propensity for violence and trial court determined he might try to escape).

### Claim 11 - The trial court violated Petitioner's constitutional rights when it death qualified the venire.

Petitioner next contends that his constitutional rights were violated when the trial court "death qualified" the venire.  (Dkt. 59 at 118.)  He contends his right to a fair and impartial jury was denied because the death qualification improperly excluded jurors for cause.  He argues that jurors did not at the time of trial play a role in sentencing and that the "trial court did nothing to clarify that the members of the venire who were automatically excluded because of their anti-death penalty views would have been unable to be fair and impartial in determining guilt."  (*Id.* at 120.)

As a threshold matter, Respondents contend that although Petitioner presented this claim in his appeal in *Lee II* (Drury proceeding), he did not raise such a claim with respect to *Lee I* (Reynolds and Lacey proceeding).  Upon review, the Court agrees that this claim has been properly exhausted with respect to the Drury proceeding only.

*Background*

The jury questionnaire used in the Drury trial informed jurors that although they did not have a role in passing sentence, Petitioner could be sentenced to death if convicted of

first degree murder.  (ROA doc. 162 at 2-3.)[8]  The questionnaire then asked potential jurors if they had conscientious or religious beliefs or feelings about the death penalty that would affect their ability to serve as fair and impartial jurors.  (*Id*. at 3.)  The questionnaire further asked  if those feelings or beliefs were so strong "that you could not return a verdict of guilty of Murder in the 1st Degree even if you felt the State proved the defendant guilty beyond a reasonable doubt?"  (*Id.*)  Three potential jurors indicated in the questionnaire that they opposed the death penalty and that this opposition would render them unable to return a guilty verdict with regard to the first degree murder charge.  After further questioning in court re-affirmed these views, the trial court dismissed the jurors for cause.  (RT 8/23/94 at 37-42, 43-47, 57-60.)

Petitioner challenged these strikes on direct appeal.  In upholding the trial court's ruling, the Arizona Supreme Court stated:

> Defendant argues that the trial court erred by death qualifying members of the venire and dismissing potential jurors who indicated they were opposed to the death penalty.  This court rejected that argument in *State v. Willoughby*, 181 Ariz. 530, 546, 892 P.2d 1319, 1335 (1995) (no violation of Sixth Amendment right to fair and impartial jury where prospective jurors were questioned regarding their views on death penalty and two were excused after they said they could not convict at all, knowing the judge might order death sentence), *cert. denied*, 516 U.S. 1054, 116 S.Ct. 725, 133 L.Ed.2d 677 (1996).

*Lee II*, 189 Ariz. at 617, 944 P.2d at 1231.

*Analysis*

Clearly established federal law holds that the death-qualification process in a capital case does not violate a defendant's right to a fair and impartial jury.  *See Lockhart v. McCree*, 476 U.S. 162, 178 (1986); *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Adams v. Texas*, 448 U.S. 38, 45 (1980); *see also Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996) (death qualification of Arizona jurors not inappropriate).  As a result, the mere fact the trial court death-qualified the venire does not establish a federal constitutional violation.

---

[8]     "ROA doc." refers to four volumes of sequentially-numbered documents in the Drury record on appeal filed with the Arizona Supreme Court in Case No. CR-94-0367-AP. (*See* Dkt. 18.)

1   Petitioner argues that *Gray v. Mississippi*, 481 U.S. 648 (1987), places an obligation
2   upon the trial judge in questioning jurors on this question to determine, despite their initial
3   indications, if they could still be fair and impartial. (Dkt. 59 at 119.) He argues that under
4   *Gray*, "[a] potential juror may only be excluded if he or she is 'irrevocably committed' to
5   voting against the death penalty prior to trial, regardless of the facts and circumstances of the
6   case." (*Id.*)

7   The Court has reviewed the trial court's questioning of the three potential jurors at
8   issue. In each case, the court did follow up on their questionnaire responses and attempted
9   to determine if these jurors could render a fair and impartial verdict despite their opposition
10   to the death penalty. In each instance, the juror indicated that he or she still could not act
11   fairly and impartially. (RT 8/23/94 at 40-42, 45-47, 57-60.) Thus, the trial court satisfied
12   the test urged by Petitioner.

13   Petitioner also argues that death-qualification was inappropriate because at the time
14   of these proceedings the judge and not the jury passed sentence. Thus, the jurors would
15   never be called upon to decide if he should be sentenced to death. Petitioner cites no
16   Supreme Court authority indicating that this fact renders death-qualification unconstitutional
17   nor is the Court aware of any authority for this proposition. As a result, this argument cannot
18   form a basis for federal habeas relief. *See Williams*, 529 U.S. at 381; *Musladin*, 549 U.S. at
19   76. Moreover, each of these jurors indicated that the mere possibility that a death sentence
20   might be imposed by the judge would render them unable to fairly consider the evidence and
21   render a guilty verdict if the evidence so warranted. (RT 8/23/94 at 40-42, 45, 58-59.) For
22   all of these reasons, the decision of the Arizona Supreme Court that the strikes for cause were
23   proper was neither contrary to nor an unreasonable application of controlling Supreme Court
24   law.

25   **Claim 12 - The trial court violated Petitioner's constitutional rights when
   it instructed the jury on the definition of premeditation.**

26   Petitioner alleges that the trial court's jury instruction regarding premeditation
27   violated his federal right to due process. (Dkt. 59 at 120.) He concedes this claim was never

presented in state court and requests permission to hold these proceedings in abeyance while he returns to state court to exhaust it.  (*Id.*; Dkt. 82 at 65.)  Petitioner argues he has an available remedy under Arizona's Rule 32 to file an untimely successive PCR petition because the claim is based on a change in the law.  *See* Ariz. R. Crim. P. 32.2(g).  The Court disagrees and notes that during the pendency of these proceedings Petitioner did return to state court to file a successive petition.  He did not include Claim 12 in that petition, which was summarily dismissed by the state court. (*See* Dkt. 125.)  Regardless, the Court finds that Claim 12 is plainly meritless.

An allegedly improper jury instruction will merit habeas relief only if "the instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. at 72; *see Jeffries v. Blodgett,* 5 F.3d 1180, 1195 (9th Cir. 1993). The instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Id.* (quoting *Cupp v. Naughten,* 414 U.S. 141, 147 (1973)).  It is not sufficient for a petitioner to show that the instruction is erroneous; instead, he must establish that there is a reasonable likelihood that the jury applied the instruction in a manner that violated a constitutional right.  *Id.*; *Carriger v. Lewis*, 971 F.2d 329, 334 (9th Cir. 1992) (en banc).  "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe,* 431 U.S. 145, 154 (1977).  Petitioner cannot make this showing.

At trial, the court provided the following instruction with respect to premeditation:

> Premeditation means the defendant's intention or knowledge existed before the killing, long enough to permit reflection.  However, the reflection differs from intent or knowledge that conduct will cause death.  *It may be as instantaneous as successive thoughts in the mind* and it may be proven by circumstantial evidence.

> It is this period of reflection, regardless of its length, which distinguishes first degree murder from intentional or knowing second degree murder.  An act is not done with premeditation if it is the instant sudden quarrel or heat of passion.

(RT 3/23/94 at 81 (emphasis added); *see also* RT 8/29/94 at 57-58.)  This instruction, with its statement that premeditation requires a "period of reflection," accurately described state law regarding premeditation.  At the time of Petitioner's trial, A.R.S. § 13-1101(1) defined premeditation as follows:

> "Premeditation" means that the defendant acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection.  An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion.[9]

A.R.S. § 13-1101(1) (1997). Arizona courts had further explained:  "The necessary premeditation, however, may be as instantaneous as successive thoughts of the mind, and may be proven by either direct or circumstantial evidence."  *State v. Kreps*, 146 Ariz. 446, 449, 706 P.2d 1213, 1216 (1985); *see State v. Spears*, 184 Ariz. 277, 289, 908 P.2d 1062, 1074 (1996); *State v. Lopez*, 158 Ariz. 258, 262, 762 P.2d 545, 549 (1988);  *State v. Sellers*, 106 Ariz. 315, 316, 475 P.2d 722, 724 (1970).

As Petitioner notes, the Arizona Supreme Court  has since "discouraged" use of the phrase "instantaneous as successive thoughts in the mind" in jury instructions.  *State v. Thompson*, 204 Ariz. 471, 479, 65 P.3d 420, 428 (2003).  The *Thompson* court, resolving conflicting decisions of the Arizona Court of Appeals, held that the statutory definition of premeditation requires actual reflection and not the mere passage of time.  *Id.* at 478, 65 P.3d at 427.  However, contrary to Petitioner's assertion, the Arizona Supreme Court did not find the phrase, "instantaneous as successive thoughts in the mind," to be constitutionally impermissible.  *Id.* at 479, 65 P.3d at 428.

Moreover, review of the instruction given at Petitioner's trials does not support Petitioner's claims of a constitutional violation.  The instruction does not permit a finding of premeditation based solely on the passage of time.  First, it explicitly distinguishes intent as existing before, and as something distinct from, reflection.  Second, the exclusion of acts

---

[9]      In 1998, A.R.S. § 13-1101(1) was amended to include the clause, "Proof of actual reflection is not required."

that are "the instant sudden quarrel or heat of passion" from the definition of premeditation

clarifies that impulsive acts do not satisfy the premeditation requirement. Third, nothing in

the prosecutor's closing argument or the court's instructions inaccurately suggested that the

State needed only to prove the time element of reflection in lieu of actual reflection.

Moreover, review in the context of the entire trial reinforces the view that Petitioner's

due process rights were not violated. *See Estelle*, 502 U.S. at 72 (instructions "may not be

considered in artificial isolation" but in the context of the instructions as a whole and the

entire trial record). Here, separate from premeditated murder, Petitioner was also convicted

of felony murder with respect to each of the three killings. (RT 3/24/94 at 2; RT 8/29/94 at

69.) Premeditation is not a factor relevant to felony murder.[10] As a result, any error

regarding the premeditation instruction did not so infect the trials with error that it rendered

his convictions a violation of due process. Thus, Petitioner is not entitled to habeas relief

with respect to this claim.

**Claim 13 - The trial court violated Petitioner's constitutional rights when it instructed the jury that it could consider the lesser included offenses of second-degree murder and reckless manslaughter only if it first unanimously found Petitioner not guilty of the greater offense of first-**

---

[10]      In the Reynolds/Lacey trial, the court gave the following felony murder instruction:

The crime of first degree murder, felony murder, requires proof of the following two things:

First, that the defendant, acting either alone or with another person, committed or attempted to commit, in the case regarding Linda Reynolds, sexual assault, kidnapping or armed robbery, or in the case regarding David Lacey, armed robbery.

And second, in the course of and in furtherance of this crime or immediate flight from this crime, the defendant or another person caused the death of any person.

(RT 3/23/94 at 81-82.) The court gave essentially the same instruction in the Drury trial. (RT 8/29/94 at 58.)

1    **degree murder.**

2        Petitioner argues that in both the Reynolds/Lacey and Drury trials, the court's

3    instructions requiring the jury to first acquit him of first degree murder before it was

4    permitted to consider lesser-included offenses violated his constitutional rights.  (Dkt. 59 at

5    121; RT 3/23/94 at 80; RT 8/29/94 at 57.)  Petitioner concedes that at the time the instruction

6    was given it was approved by the Arizona Supreme Court pursuant to *State v. Wussler*, 139

7    Ariz. 428, 679 P.2d 74 (1984).  In 1996, however, the Arizona Supreme Court adopted a

8    "reasonable efforts" instruction in lieu of *Wussler*'s "acquittal first" requirement.  *See State*

9    *v. LeBlanc*, 186 Ariz. 437, 438, 924 P.2d 441, 442 (1996).

10        On direct appeal, Petitioner asserted that the *Wussler* instruction given at both trials

11   violated his rights under the Sixth Amendment.  The Arizona Supreme Court disagreed:

12          Defendant asks this court to reconsider the instruction approved in *State*
          *v. Wussler* requiring juries to agree that a defendant was not guilty of the
13        greater charge before considering the lesser included charge.  Recently, in
          *LeBlanc*, this court overruled *Wussler*:

14              It now appears that requiring a jury to do no more than
15            use reasonable efforts to reach a verdict on the charged offense
              is the better practice and more fully serves the interest of justice
16            and the parties. . . .

17        Our decision in *LeBlanc*, however, having been filed subsequent to the crimes
          charged here, does not apply to this case:

18              Although today's decision directs trial courts to abandon
19            the *Wussler* rule in favor of a "reasonable efforts" instruction,
              we remain persuaded that the acquittal-first requirement does
20            not violate the United States or Arizona Constitutions.
              Moreover, the giving of a *Wussler*-type instruction does not rise
21            to the level of fundamental error.

22              Finally, because the change we make today is procedural
              in nature, adopted for purposes of judicial administration, its
23            application is prospective only.

24        Courts commenced using a "reasonable efforts" instruction no later than
          January 1, 1997.

25              Because this case was tried in 1994, we find that the trial court did not
26        err by giving an "acquittal-first" jury instruction regarding lesser-included
          offenses consistent with *Wussler*.

27

*Lee I*, 189 Ariz. at 602, 944 P.2d at 1216 (citations omitted).[11]

Habeas relief cannot be granted if the United States Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams v. Taylor*, 529 U.S. at 381; *Carey v. Musladin*, 549 U.S. at 76. Petitioner has cited no case law to support his position that the trial court's "acquittal-first" instructions violated his federal constitutional rights, and this Court has found none.[12] As a result, this argument cannot support a claim for federal habeas relief.

**Claim 14 - The trial court violated Petitioner's constitutional rights when it considered victim impact evidence in sentencing**.

During sentencing following the Reynolds/Lacey trial, family members of the victims were allowed to offer their opinions about the appropriate sentences Petitioner should receive. Petitioner asserts this type of testimony was improper and violated his federal constitutional rights, including his right to a fair trial. (Dkt. 59 at 123-24.) The only specific instance of impropriety cited by Petitioner concerns testimony from Linda Reynolds's mother, Eleanor Barton, who stated he "deserves the death penalty" and urged the judge to "give him the death penalty." (RT 6/7/94 at 90, 91.)

In its special verdict, the sentencing court explained its basis for sentencing Petitioner

---

[11]     The Arizona Supreme Court summarily rejected this claim in the Drury appeal, citing its determination in *Lee I*. *See Lee II*, 189 Ariz. at 613, 944 P.2d at 1227.

[12]     In fact, as noted by the Arizona Supreme Court, in *United States v. Tsanas*, 572 F.2d 340, 346 (2nd Cir. 1978), the Second Circuit Court of Appeals held that a *Wussler*-type instruction was not wrong as a matter of law. In addition, in *United States. v. Jackson*, 726 F.2d 1466, 1469 (9th Cir. 1984), the Ninth Circuit cited *Tsanas* and held that, it was lawful to give a *Wussler* instruction if the defendant stated no choice, but that it would be error to reject a different instruction if timely offered. *See id.* In this case, Petitioner's counsel specifically agreed to a *Wussler* instruction while settling instructions. (*See* RT 3/23/94 at 5.) Subsequently, after the jury was instructed and in deliberation, counsel voiced objections to the instruction but the court overruled him. (*See id.* at 96-97.) This objection was not timely and, thus, the giving of the *Wussler* instruction was not contrary to the holding in *Jackson*.

to death for both the Reynolds and Lacey murders.  Specifically, the court determined that the evidence established a finding of several aggravating factors common to both murders, including: (1) having been convicted of another offense for which life imprisonment or death is possible; (2) having been previously convicted of a felony involving the use or threat of violence to another person; and (3) committing the offense as consideration for the receipt or in expectation of the receipt of anything of value.  (RT 6/23/94 at 20-23.)  In addition, the court found that Linda Reynolds' murder was committed in an especially heinous, cruel, or depraved manner.  (*Id.* at 23-26.)  Regarding David Lacey's murder, the Court determined that, although the murder could not be deemed cruel, it was depraved.[13]  (*Id*. at 26.)

        The court weighed the aggravating circumstances against the evidence of mitigation.  The court determined that the statutory factor concerning Petitioner's age (19 at the time of the crime) was satisfied.  (*Id.* at 28.)  The Court then considered non-statutory mitigation, including his lack of a significant prior criminal history, his deprived childhood, his post-arrest conduct, including his cooperation with law enforcement, and "various other factors and circumstances raised by defendant in the memorandum and via testimony and exhibits in the aggravation mitigation hearing."  (*Id.* at 30.)  The court then weighed all of the mitigating evidence and determined it was "not sufficiently substantial to outweigh the aggravating circumstances proved by the state."  (*Id*. at 32-33.)

        On appeal, Petitioner raised a claim alleging that the sentencing court improperly considered victim impact evidence.  The Arizona Supreme Court rejected this argument in cursory fashion citing a state case.  *See Lee I*, 189 Ariz. at 607, 944 P.2d at 1221.  The court cited no federal case law.  This court will nevertheless uphold that determination unless it is contrary to controlling Supreme Court law.  *See* 28 U.S.C. § 2254(d).

        In *Booth v. Maryland*, 482 U.S. 496, 509 (1987), the Supreme Court held that the introduction of a victim impact statement during the sentencing phase of a capital case

---

        [13]    This finding was reversed by the Arizona Supreme Court on appeal. *Lee I*, 189 Ariz. at 606, 944 P.2d at 1220.

violated the Eighth Amendment.  In *Payne v. Tennessee*, 501 U.S. 808, 827, 830 (1991), the Supreme Court revisited *Booth* and overruled it in part, holding that the Eighth Amendment does not erect a per se barrier to admission of victim impact evidence but left intact *Booth's* prohibition on the admissibility of characterizations and opinions from the victim's family about the crime, the defendant, or the appropriate sentence to be imposed.  *Id*. at 830 n.2.

Under Arizona law at the time of trial, the trial judge, rather than a jury, determined the penalty in a capital case.  A.R.S. § 13-703.  As the Arizona Supreme Court explained, judges are presumed to know and apply the law.  *State v. Gulbrandson*, 184 Ariz. 46, 66, 906 P.2d 579, 599 (1995); *see Jeffers v. Lewis*, 38 F.3d 411, 415 (9th Cir. 1994).  Therefore, "in the absence of any evidence to the contrary, [the Court] must assume that the trial judge properly applied the law and considered only the evidence he knew to be admissible." *Gretzler v. Stewart*, 112 F.3d 992, 1009 (9th Cir. 1997).

Other than the statement of Eleanor Barton at the sentencing hearing, Petitioner presents no evidence indicating the sentencing court was swayed by anything other than the appropriate criteria required in passing a death sentence.  In fact, a review of the special verdict rendered at sentencing supports the conclusion that the state court's sentence of death for the Reynolds/Lacey murders was based solely on its findings that certain statutory aggravating factors had been established based on the evidence presented and that the mitigation evidence offered by Petitioner did not warrant a lesser sentence.  (*See* RT 6/23/94 at 20-33.)  Nothing in the court's rationale indicated it was swayed at sentencing by Ms. Barton's statements urging that Petitioner be put to death.  In the absence of any clear indication that the court improperly considered those statements, this Court assumes the sentencing court followed the Arizona guidelines in passing sentence. *See Gretzler*, 112 F.3d at 1009.

Moreover, the Arizona Supreme Court on appeal reweighed the aggravating and mitigating evidence and independently determined that the death sentences given for both the Reynolds and Lacey murders were appropriate.  *See Lee I*, 189 Ariz. at 603-07, 944 P.2d

1
2
3
4

at 1217-21.  In so doing, that court likewise predicated its determination solely on its conclusion that certain aggravating circumstances had been established and that the mitigation presented was not "sufficiently substantial, taken either separately or cumulatively, to call for leniency."  *Id.* at 607; 944 P.2d at 1221.

5
6
7

Because there is no evidence that the state courts misapplied the law and improperly considered the wishes of family members when it imposed the death sentences, Petitioner is not entitled to habeas relief with respect to this claim.

8
9
10

**Claim 15 - The statutory provisions governing Arizona's capital punishment scheme are unconstitutional because they merely require the State to prove the defendant's eligibility for the death penalty, rather than the appropriateness of the death penalty in the defendant's particular case.**

11
12
13
14
15
16
17
18
19
20
21

Petitioner argues that the death penalty scheme in Arizona is unconstitutional. Specifically, he contends a state sentencing court must do more than simply determine that a defendant is death eligible; rather, it must determine that such a sentence is appropriate. He asserts the sentencing court did not do this and that this violates his federal constitutional rights.  (Dkt. 59 at 124.)  Petitioner advanced this claim only with respect to proceedings in the Reynolds/Lacey murders.  The Arizona Supreme Court summarily rejected this claim on direct appeal, citing *Walton v. Arizona*, 497 U.S. 639 (1990), *overruled in part on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).  *Lee I*, 189 Ariz. at 607, 944 P.2d at 1221. Petitioner acknowledges that *Walton* upheld Arizona's death penalty statute and procedures but argues it was wrongly decided and should be overruled.  It is not within the province of this Court to do so.

22
23
24
25
26
27

In *Furman v. Georgia*, 408 U.S. 238 (1972), the United States Supreme Court held the death penalty statutes of Georgia and Texas to be unconstitutional because they allowed arbitrary and unguided imposition of capital punishment.  *Furman* caused many states to enact new capital statutes.  A number of these statutes survived the Court's further scrutiny in *Gregg v. Georgia*, 428 U.S. 153 (1976).  Observing that the death penalty is "unique in its severity and irrevocability," *id*. at 187, the *Gregg* Court concluded that a death sentence

may not be imposed unless the sentencing authority focuses attention "on the particularized nature of the crime and the particularized characteristics of the individual defendant." *Id.* at 206. In imposing the death sentence, the sentencer must find the presence of at least one aggravating factor and then weigh that factor against the evidence of mitigating factors. *Id.* The Court refined these general requirements in *Zant v. Stephens*, 462 U.S. 862, 877 (1983), holding that a constitutionally valid capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." A death penalty scheme must provide an "objective, evenhanded and substantively rational way" for determining whether a defendant is eligible for the death penalty. *Zant*, 462 U.S. at 879.

In addition to the requirements of determining eligibility for the death penalty, the Court has imposed a separate requirement for the selection decision, "where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994). "What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant*, 462 U.S. at 879. Accordingly, a statute that "provides for categorical narrowing at the definition stage, and for individualized determination and appellate review at the selection stage" will ordinarily satisfy Eighth Amendment and Due Process concerns, *id.*, so long as the state ensures "that the process is neutral and principled so as to guard against bias or caprice." *Tuilaepa*, 512 U.S. at 973.

Defining specific "aggravating circumstances" is the accepted "means of genuinely narrowing the class of death-eligible persons and thereby channeling the [sentencing authority's] discretion." *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988). Each defined circumstance must meet two requirements. First, "the [aggravating] circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of a murder." *Tuilaepa*, 512 U.S. at 972; *see Arave v. Creech*, 507 U.S.

463, 474 (1993).  Second, "the aggravating circumstance may not be unconstitutionally vague."  *Tuilaepa*, 512 U.S. at 972; *see Arave*, 507 U.S. at 473; *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980).

Arizona's death penalty scheme allows only certain, statutorily defined, aggravating circumstances to be considered in determining eligibility for the death penalty.  A.R.S. § 13-703(F).  "The presence of aggravating circumstances serves the purpose of limiting the class of death-eligible defendants, and the Eighth Amendment does not require that these aggravating circumstances be further refined or weighed by [the sentencer]."  *Blystone v. Pennsylvania*, 494 U.S. 299, 306-07 (1990).  Not only does Arizona's sentencing scheme generally narrow the class of death-eligible persons, the aggravating factors delineated in § 13-703(F) do so specifically.  Rulings of the United States Supreme Court and the Ninth Circuit have upheld Arizona's death penalty statute against challenges that particular aggravating factors, including § 13-703 (F)(5) (pecuniary gain) and (F)(6) (heinous, cruel and depraved), do not adequately narrow the sentencer's discretion.  *See Lewis v. Jeffers*, 497 U.S. 764, 774-77 (1990); *Walton*, 497 U.S. at 649-56; *Woratzeck v. Stewart*, 97 F.3d 329, 335 (9th Cir. 1996).  The Ninth Circuit has explicitly rejected the argument that Arizona's death penalty statute is unconstitutional because "it does not properly narrow the class of death penalty recipients."  *Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998).

Regarding the Reynolds/Lacey convictions, the court found multiple aggravating circumstances to be proven and imposed the death sentence with respect to each murder.  (*See* RT 6/23/94 at 20-27.)  In addition, the Arizona Supreme Court independently reviewed these findings, and in one instance (whether Lacey's murder was especially depraved pursuant to A.R.S. § 13-703(F)(6)) reversed the finding of an aggravating factor but otherwise affirmed the sentencing court.  *See Lee I*, 189 Ariz. at 603-07, 944 P.2d at 1217-21.  Petitioner does not challenge the correctness of these findings; he simply asserts that Arizona's statutory scheme is unconstitutional.  However, he acknowledges that the U.S. Supreme Court determined that the Arizona statutory scheme was constitutional in *Walton*.

1    In particular, the *Walton* Court held that, because the Arizona statutory scheme does not

2    restrict the type of mitigation which may be offered by a defendant, it does not create an

3    unconstitutional presumption that death is the proper sentence.  *See* 497 U.S. at 651-52.

4          In addition, Petitioner's assertion that the trial court passed the sentences of death

5    without specifically determining, under the law and the facts that the death sentences were

6    appropriate, is factually erroneous.  The sentencing court passed sentence after recounting

7    that numerous statutory aggravating factors had been established by the evidence.  The court

8    then recounted in detail the statutory and nonstatutory mitigation presented by Petitioner,

9    weighed that against the proven aggravating factors, and determined that a lesser sentence

10   was not appropriate.  (*See* RT 6/23/94 at 20-34.)  Only after making these findings did the

11   court sentence Petitioner to death.  As noted, the Arizona Supreme Court likewise conducted

12   an independent review of this evidence and upheld the death sentences.  *See Lee I*, 189 Ariz.

13   at 603-07, 944 P.2d at 1217-21.  For all of these reasons, the Arizona Supreme Court's

14   rejection of this claim was neither contrary to, nor an unreasonable application of, clearly

15   established federal law.

16        **Claim 16 - The death penalty statute under which Petitioner was**
        **sentenced to death was unconstitutional because: (1) it allowed the**
17      **imposition of a death sentence by the trial judge, rather than requiring a**
        **jury to conclude that the state had established by proof beyond a**
18      **reasonable doubt all facts essential to the imposition of the death penalty;**
        **and (2) it failed to require that Petitioner receive notice by indictment of**
19      **all aggravating factors and all facts necessary to make him eligible for the**
        **death penalty.**

20        In *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court held that aggravating

21   factors that render a defendant eligible for the death penalty must be found by a jury, not a

22   judge, as previously approved in *Walton v. Arizona*.  However, in *Schriro v. Summerlin*, 542

23   U.S. 348 (2004), the Court held that *Ring* does not apply retroactively to cases, such as

24   Petitioner's, that were already final on direct review at the time *Ring* was decided.

25   Therefore, as a matter of law, Petitioner is not entitled to relief on his claim that the lack of

26   jury findings as to aggravating factors violated his constitutional rights.

27        Petitioner also contends his constitutional rights were violated because the State failed

to provide notice in the indictment of all aggravating factors and facts necessary to make him eligible for the death penalty. Although the Due Process Clause guarantees defendants a fair trial, it does not require the states to observe the Fifth Amendment's provision for presentment or indictment by a grand jury. *Hurtado v. California*, 110 U.S. 516, 538 (1884); *Branzburg v. Hayes*, 408 U.S. 665, 688 n.25 (1972). Moreover, the Arizona Supreme Court has expressly rejected the argument that *Ring* requires that aggravating factors be alleged in an indictment and supported by probable cause. *McKaney v. Foreman*, 209 Ariz. 268, 270, 100 P.3d 18, 20 (2004). Petitioner has presented no authority to the contrary. This claim is without merit.

> **Claim 17 - Arizona's statutory scheme for the imposition of the death penalty is unconstitutional because the prosecutor's discretion to seek the death penalty is limitless, standardless and arbitrary.**

Citing *Furman*, Petitioner asserts:

> The Eighth Amendment requires that the sentencer be able to meaningfully distinguish between those few cases where the death penalty is imposed and the many in which it is not. In Arizona, however, there is simply no way to distinguish capital cases from non-capital cases. This is because, in each case, the prosecutor makes a standardless and arbitrary decision as to whether to seek the death penalty.

(Dkt. 59 at 126-27.) Petitioner presented this claim on direct appeal. The Arizona Supreme Court denied all claims challenging the constitutionality of Arizona capital sentencing scheme by citing *Walton*. *Lee I*, 189 Ariz. at 607, 944 P.2d at 1221.

Petitioner's citation to *Furman* is unpersuasive. As already recounted in addressing Claim 15, *Furman* and its progeny stand for the proposition that the statutory scheme for *imposing* a death sentence may not be unguided and arbitrary. *See Gregg*, 428 U.S. at 206; *Zant*, 462 U.S. at 477, 479. As long as the system provides safeguards to ensure this, it passes constitutional muster. As discussed in addressing Claim 15, the Arizona statutory scheme meets this test. Petitioner cites no authority to support his contention that a statutory scheme is unconstitutional simply because it does not have specified curbs on the discretion of a prosecutor in deciding whether to seek a death sentence, particularly in light of the requirements placed upon the sentencer in determining whether to impose a death sentence.

1   As a result, this claim cannot form a basis for federal habeas relief. *See Williams*, 529 U.S.

2   at 381; *Musladin*, 549 U.S. at 76. The decision of the Arizona Supreme Court denying this

3   claim was neither contrary to, or an unreasonable determination of controlling Supreme

4   Court law.

5           **Claim 18 - The pecuniary gain aggravating factor is unconstitutional because it fails to narrow the class of defendants eligible for the death penalty.**

6

7           Petitioner notes he was unanimously convicted of felony murder for each of the three

8   murders and that the underlying felony common to each murder was armed robbery.[14]  He

9   contends that armed robbery necessarily entails a motive of pecuniary gain and that "using

10  pecuniary gain as an aggravating factor in a case in which the underlying felony is armed

11  robbery merely replicates an element of the underlying offense." (Dkt. 59 at 127.)  As a

12  result, he argues that the pecuniary gain aggravating factor "fails to narrow the class because,

13  by definition, *all* felony-murder defendants whose crimes are predicated on a theft-related

14  felony automatically become death eligible." (*Id.* at 127-28.)

15          Petitioner raised this claim in his appeal of the Drury conviction in *Lee II*.[15]  (Dkt. 68,

16  Ex. D at 54-55.)  In rejecting it, the Arizona Supreme Court stated:

17          The legislature may establish a sentencing scheme in which an element of a crime could also be used for enhancement and aggravation purposes.  Further,

18  this court has stated that pecuniary gain is not synonymous with robbery.  In *Carriger*, this court explained, "To prove robbery, the state must show a *taking*

19  of property from the victim; to prove pecuniary gain, the state must show the actor's *motivation* was the expectation of pecuniary gain."  This court has

20

21       [14]    Petitioner was also convicted of the predicate felonies of kidnapping, sexual

22  assault, and theft with respect to Linda Reynolds.  (RT 3/24/94 at 2-4.)

23       [15]    Petitioner did not raise this claim in his appeal from the Reynolds/Lacey

24  murders but did include it in his consolidated PCR petition. (Dkt. 68, Ex. F at 9.)  The trial court denied the claim, finding it precluded because it had been raised on direct appeal. (Dkt.

25  68, Ex. G at 3.)  Both parties acknowledge that the trial court mistakenly determined that this claim was raised and denied on appeal in *Lee I* when in fact it had not been.  Irrespective of

26  any question of procedural default in *Lee I*, the claim was exhausted in *Lee II* and will be addressed on the merits.

27

1
2

rejected the argument that finding pecuniary gain as an aggravating circumstance is unconstitutional where it repeats an element of first degree felony murder based on an underlying armed robbery.

3

*Lee II*, 189 Ariz. at 620, 944 P.2d at 1234 (citations omitted).

4

As set forth in the Court's discussion of Claim 15, the Ninth Circuit has specifically

5

upheld the pecuniary gain aggravating factor (A.R.S. § 13-703(F)(5)) against constitutional

6

challenges that it does not adequately narrow the class of defendants eligible for the death

7

penalty. *See Woratzeck*, 97 F.3d at 334-35 (applying the principles enunciated in *Lowenfield*,

8

481 U.S. at 244, and specifically rejecting the notion that the (F)(5) pecuniary gain

9

aggravating factor is automatically applicable to someone convicted of robbery felony

10

murder). For that reason, the determination of the Arizona Supreme Court on this issue was

11

not contrary to, or an unreasonable application of, controlling Supreme Court law.

12
13

**Claim 19 - Arizona's statutory scheme for imposing the death penalty is unconstitutional because it does not sufficiently channel the sentencer's discretion.**

14

Petitioner argues that the Arizona death penalty scheme doesn't sufficiently "channel"

15

the sentencer's discretion. He further argues:

16
17
18
19

Arizona's aggravating circumstances are also exceptionally broad. Any murder that has no apparent motive, or that is motivated by a desire to eliminate a witness, or that is motivated by hatred or revenge (and is therefore "relished") is a death penalty crime. Any murder in which the killer uses excessive force, or in which he uses sufficient force, is a death penalty crime. Any murder in which the victim experiences fear or uncertainty as to his fate, or in which he is conscious and able to feel pain during the killing, is "cruel" and therefore a death penalty crime.

20

(Dkt. 59 at 130-31.) Respondents contend this claim is procedurally defaulted because it was

21

not raised on appeal but only during PCR proceedings. The Court disagrees. Review of the

22
23

appellate brief filed in *Lee I*, reveals that Petitioner advanced a claim challenging the

24

constitutionality of Arizona's death penalty statutory scheme predicated on the notion that

25

"it lacks ascertainable guidelines for the sentencer to follow in weighing aggravating and

26

mitigating factors in violation of the U.S. Const. amends. V, XIV." (Dkt. 68, Ex. C at 62.)

27

The Arizona Supreme Court summarily denied the claim. *Lee I*, 189 Ariz. at 607, 944 P.2d
at 1221.

1
2
3
4
5
6
7
8
9
10
11

This claim is another variation of a series of claims raised by Petitioner challenging the constitutionality of Arizona's statutory death sentencing scheme.  In fact, this claim presents essentially the same question raised in Claim 15.  As stated in addressing Claim 15, Arizona's death penalty scheme allows only certain, statutorily-defined aggravating circumstances to be considered in determining eligibility for the death penalty.  This scheme has been found constitutionally sufficient.  *See Lewis*, 497 U.S. at 774-77; *Walton*, 497 U.S. at 649-56; *Woratzeck*, 97 F.3d at 334-35; *Smith*, 140 F.3d at 1272.   Again, Petitioner does not challenge any of the particular findings made by the sentencing court.  He simply argues that the Arizona statutory scheme is unconstitutional.  This claim is without merit.  The determination of the Arizona Supreme Court rejecting this claim was not contrary to, or an unreasonable application of, controlling Supreme Court law.

12

**Claim 20 - Petitioner was unconstitutionally denied the right to voir dire the trial judge.**

13
14
15
16
17
18

Petitioner contends his constitutional rights were violated when he was denied the opportunity to voir dire the trial judge "regarding his attitudes about capital punishment to assure that a capital defendant will not be placed in the constitutionally untenable position of being before a sentencer who believes that the death penalty is the most appropriate punishment for first degree murder." (Dkt. 59 at 134.)  Petitioner raised this claim in one of his appeals, and it was summarily denied.[16]  *Lee I*, 189 Ariz. at 607, 944 P.2d at 1221.

19
20
21
22
23

The federal constitution requires only that a defendant receive a fair trial before a fair and impartial judge with no bias or interest in the outcome.  *Bracey v. Gramley*, 520 U.S. 899, 904-05 (1997).  Petitioner makes no allegation of bias or interest on behalf of the judge who presided at his trial or sentencing.   Petitioner cites no authority, let alone Supreme

24

25
26
27

[16]      Respondents concede that this claim was raised on appeal in *Lee I*, but argue that it was not raised in *Lee II*.  As a result, they contend the claim was not exhausted and is procedurally defaulted with respect to Drury.  In light of the fact this claim was raised in *Lee I* as part of a series of challenges to the constitutionality of the Arizona death penalty statutory scheme,  the Court will address it on the merits.

Court authority, to support his assertion that the federal constitution affords him the right to voir dire the sentencing judge to determine his views on the death penalty.  As a result, this claim cannot form the basis for federal habeas relief.  *See Williams*, 529 U.S. at 381; *Musladin*, 549 U.S. at 76.  The decision of the Arizona Supreme Court denying this claim was neither contrary to nor an unreasonable application of controlling Supreme Court law.

**Claim 21 - Petitioner's death sentences are unconstitutional because he was denied the procedural safeguard of a proportionality review of his sentences.**

Respondents contend this claim was not properly exhausted in state court and is procedurally defaulted.  (Dkt. 59 at 78.)  In fact, Petitioner did present this claim in state court in his PCR petition, but the claim was found to be precluded by the court pursuant to Rule 32.2(a)(3) of the Arizona Rules of Criminal Procedure because it could have been presented on direct appeal but was not.  (Dkt. 68, Ex. G at 4-5.)  Irrespective of any issue of exhaustion or procedural default, the Court concludes this claim is without merit and will deny relief on that basis.  *See* 28 U.S.C. § 2254(b)(2).  The Arizona Supreme Court abandoned proportionality review prior to Petitioner's appeal,  *State v. Salazar*, 173 Ariz. 399, 844 P.2d 566 (1992), and the U. S. Supreme Court has held that there is no federal constitutional right to proportionality review of a death sentence, *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987) (citing *Pulley v. Harris*, 465 U.S. 37, 43-44 (1984)).  Thus, any failure by the Arizona Supreme Court to conduct such a review cannot form a basis for federal habeas relief.  *Williams*, 529 U.S. at 381; *Musladin*, 549 U.S. at 76.

## CERTIFICATE OF APPEALABILITY

In the event Petitioner appeals from this Court's judgment, and in the interests of conserving scarce resources that otherwise might be consumed drafting an application for a certificate of appealability to this Court, the Court on its own initiative has evaluated the claims within the Amended Petition for suitability for the issuance of a certificate of appealability.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d at 864-65.

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal

1   is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a

2   certificate of appealability (COA) or state the reasons why such a certificate should not issue.

3   Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made

4   a substantial showing of the denial of a constitutional right." With respect to claims rejected

5   on the merits, a petitioner "must demonstrate that reasonable jurists would find the district

6   court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529

7   U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n. 4 (1983)). For

8   procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the

9   petition states a valid claim of the denial of a constitutional right and (2) whether the court's

10  procedural ruling was correct. *Id.*

11      The Court finds that reasonable jurists could debate its resolution of Claims 4 and 8.

12  The Court therefore grants a certificate of appealability as to these claims. For the reasons

13  stated in this order, as well as the Court's orders of February 4, 2005 (Dkt. 94), March 24,

14  2006 (Dkt. 106), and November 28, 2006 (Dkt. 125), the Court declines to issue a certificate

15  of appealability for Petitioner's remaining claims and procedural issues.

16                              **CONCLUSION**

17      For the reasons set forth above, Petitioner is not entitled to habeas relief. The Court

18  further finds that evidentiary development is neither warranted nor required.

19      Accordingly,

20      **IT IS HEREBY ORDERED** that Petitioner's Amended Petition for Writ of Habeas

21  Corpus (Dkt. 59) is **DENIED**. The Clerk of Court shall enter judgment accordingly.

22      **IT IS FURTHER ORDERED** that the stay of execution entered on November 9,

23  2001 (Dkt. 4) is **VACATED**.

24      **IT IS FURTHER ORDERED** granting a Certificate of Appealability as to the

25  following issues:

26      Whether Petitioner's constitutional rights were violated when the trial court
        failed to remove for a cause a juror who did not understand English (Claim 4);
27      and

1    Whether Petitioner was denied due process of law when the trial judge failed
     to suppress inculpatory statements made to police (Claim 8).

2    **IT IS FURTHER ORDERED** that the Clerk of Court send a courtesy copy of this

3    Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington,

4    Phoenix, Arizona 85007-3329.

5    DATED this 6th day of January, 2009.

6

7

8

9    _____
                    Earl H. Carroll
10               United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27